UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br>a municipal corporation,<br>441 4th Street, N.W.,<br>Washington, D.C. 20001,<br><br>       Plaintiff,<br><br>       v.<br><br>MARQUEE HOLDINGS INC.,<br>a Delaware corporation,<br>d/b/a AMC Entertainment Inc.,<br>1221 Avenue of the Americas<br>39th Floor<br>New York, NY 20020-1080<br><br>and<br><br>LCE HOLDINGS, INC.<br>a Delaware corporation,<br>d/b/a Loews Cineplex Entertainment Corp.<br>711 Fifth Avenue<br>New York, NY 10022<br><br>       Defendants. | Civil Action No. _____<br><br>Judge _____<br><br>Calendar No. _____<br><br><br><br>Complaint for Equitable Relief for<br>Violation of 15 U.S.C. § 18 and<br>D.C. Official Code § 28-4502 |

## COMPLAINT

The District of Columbia, acting by and through its Attorney General, brings this civil antitrust action as *parens patriae* to remedy the competitive harm that would be caused by the proposed merger of Marquee Holdings Inc., d/b/a AMC Entertainment Inc. ("AMC"), and LCE Holdings, Inc., d/b/a Loews Cineplex Entertainment Corp. ("Loews"). The proposed merger would combine two of the three first-run mainstream movie exhibitors in the District of Columbia and would substantially lessen competition

and tend to create a monopoly in the theatrical exhibition of first-run mainstream movies in the District of Columbia, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and the D.C. Antitrust Act, D.C. Code § 28-4502.

## I. INTRODUCTION

1. AMC and Loews both operate theaters in various parts of the United States, including the District of Columbia, earning revenue through the theatrical exhibition of movies. AMC and Loews compete against each other in the market for exhibition of first-run mainstream movies.

2. AMC and Loews are two of the three exhibitors of first-run mainstream films in the District of Columbia. AMC and Loews are the largest exhibitors of first-run mainstream films in the District of Columbia, by both theaters and screens. Loews is the largest exhibitor in the District by box office revenues, with AMC essentially tied for second with the sole remaining competitor.

3. Combining AMC and Loews would create an exhibitor of first-run mainstream films in the District of Columbia with significantly greater market power than either AMC or Loews separately, and is likely to substantially lessen competition in the market for theatrical exhibition of first-run mainstream films in the District. The reduction in competition caused by the proposed merger would enhance the ability of the merged firm, and its sole remaining competitor, to raise prices in various ways, such as increased ticket prices, reduced showings, and reduced investment in theater improvements and renovations in the District of Columbia.

## II. JURISDICTION AND VENUE

4. This action is filed by the District of Columbia as *parens patriae* pursuant to the D.C. Antitrust Act, D.C. Official Code § 28-4508, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent the defendants from violating Section 28-4502 of the D.C. Antitrust Act and Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

5. Both Loews and AMC have headquarters outside of the District of Columbia, and operate theaters in the District of Columbia, a commercial activity involving interstate commerce and affecting commerce within the District of Columbia.

6. This Court has jurisdiction over the subject matter of the action and jurisdiction over the parties pursuant to 15 U.S.C. §§ 22 and 26; 28 U.S.C. §§ 1331 and 1337; 28 U.S.C. § 1367(a) (pendent jurisdiction).

7. Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b).

## III. BACKGROUND

8. Theatrical exhibition of movies is a popular source of entertainment in the United States and the District of Columbia. More than 1.5 billion movie theater tickets were sold in the United States in 2004.

9. Movie exhibitors like Loews and AMC set ticket prices, select show times and establish movie selection for each theater, based on a number of factors, including the competitive situation facing each theater. Exhibitors compete on the basis of ticket prices, and such other factors as show times, available movies, theater quality, maintenance and concessions.

IV.     **DEFENDANTS AND THE PROPOSED MERGER**

10. Marquee Holdings Inc. ("Marquee") is a Delaware corporation with its principal place of business in New York. Marquee owns and operates the AMC circuit of movie theaters. AMC has approximately 230 theaters worldwide, including two in the District of Columbia. AMC's annual box office revenues in the District of Columbia are in excess of $4.5 million.

11. LCE Holdings, Inc ("LCE") is a Delaware corporation with its principal place of business in New York. LCE owns and operates the Loews circuit of theaters, and operates the Magic Johnson and Star circuit of theaters. Loews has 200 theaters worldwide, including four in the District of Columbia. Loews' annual box office revenues in the District of Columbia are in excess of $12 million.

12. The parties announced the proposed merger transaction on June 21, 2005. As explained in the joint press release of the companies, AMC Entertainment Inc. and Loews Cineplex Entertainment Corporation are "two of the world's leading theatrical exhibition companies." Their "merger agreement . . . would result in the combination of their businesses and the merger of AMC Entertainment Inc. and Loews Cineplex Entertainment Corporation. The merger agreement also provides for the merger of their respective holding companies, Marquee Holdings Inc. and LCE Holdings, Inc., with Marquee Holdings Inc., which is controlled by affiliates of J.P. Morgan Partners, LLC and Apollo Management, L.P., continuing as the holding company for the merged businesses. The current stockholders of LCE Holdings, Inc., including affiliates of Bain Capital Partners, The Carlyle Group and Spectrum Equity Investors, would hold approximately 40% of the outstanding

capital stock of the continuing holding company. The merged company, to be called AMC Entertainment Inc., will be headquartered in Kansas City, Missouri, and will own, manage or have interests in approximately 450 theatres with about 5,900 screens in 30 states and 13 countries. . . . When combined, the company will have approximately 24,000 associates serving more than 280 million guests annually." As noted by the press release, the merger is "a combination of two of the oldest and most respected names in the business."

13. The combined AMC/Loews will be the largest exhibitor in the District of Columbia and the second largest exhibitor in the country based on number of theaters and number of screens. The combined AMC/Loews would also be the largest exhibitor in the District of Columbia and the country based upon box office revenue.

V.   **THE RELEVANT MARKETS**

   A.   **Relevant Product Market**

14. Movies differ significantly from other forms of entertainment. Viewing a movie in a theater is different from seeing a live concert, sporting event, or theatrical play. Live entertainment is typically more expensive than a movie ticket. Consumers are not likely to switch to live entertainment in response to a small but significant non-transitory increase in the price of movie tickets.

15. Viewing a movie in a theater is a different experience from viewing a digital video disk ("DVD") or videotape at home. Movies generally are available in theaters before they are legally available via DVD, videotape and electronic downloads. Renting a DVD or videotape is typically less expensive than seeing a

movie in a movie theater. Consumers seeking an out-of-home movie experience are not likely to switch to in-home movies in response to a small but significant non-transitory increase in price.

16. A movie is considered to be in its "first run" during the initial weeks following its release in a given locality. If a first run is successful, a movie may be exhibited at other theaters after the first run as part of a second or subsequent run (often called a sub-run). Sub-run theaters are not significant competition for theaters that exhibit first run mainstream movies; moreover, the District of Columbia does not currently have an active sub-run market.

17. Big-budget films intended for mass appeal with national advertising budgets, large guaranteed rentals, and wide initial release ("mainstream movies") are generally not reasonably interchangeable with "art," "independent," or foreign sub-titled movies with much smaller budgets and releases. Consequently, movie theaters with a movie selection policy of showing predominantly "art" or "independent" films are not significant competition for theaters that predominantly show first-run big-budget, mass-released mainstream films. New entry of art theaters into a relevant geographic market has a competitive effect on other art theaters, not mainstream theaters.

18. The relevant product market in which the transaction should be considered is the exhibition of first-run mainstream movies.

B. **Relevant Geographic Market**

19. Movie-goers typically do not want to travel far from their homes to attend a movie, particularly in urban areas. Accordingly, geographic markets for first-run mainstream movies are predominantly local.

20. Movie theaters in the District of Columbia tend to draw consumers mainly from within a fairly close geographic area, generally within a few miles of the theater. Movie-goers who wish to attend a movie in the city are not likely to switch to suburban theaters in response to a small but significant non-transitory increase in price for movie tickets in the District.

21. The relevant geographic market in which the transaction should be considered is the District of Columbia and smaller areas contained therein.

VI. **COMPETITIVE EFFECTS**

22. In the District of Columbia, the proposed merger would give the newly merged entity control of five of the six first-run mainstream theaters. The merged entity would control 73% of the first-run mainstream screens in the District. Moreover, the combined firm would have a box office revenue market share of 78%.

23. Using a common measure of market concentration called the Herfindahl-Hirschmann Index[1] ("HHI"), the merger would yield a post-merger HHI of approximately 6494, representing an increase of more than 2500, as measured by box office revenue. Mergers with HHI's in this range are considered

---

[1] The HHI is a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. Under the United States Department of Justice Horizontal Merger Guidelines, markets in which the HHI is in excess of 1800 points are considered to be highly concentrated. Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the Merger Guidelines. See Merger Guidelines § 1.51.

presumptively illegal by the federal antitrust enforcement agencies' guidelines, which are used by many courts to evaluate the legality of competitor mergers.

24. Even within the greater Washington metropolitan area, which includes suburban locations as far as 20-25 miles away from the District, a combined AMC/Loews would be the largest exhibitor, with a market share of 42%, and four of the five top grossing theaters.

25. Because the area of the District of Columbia only approximates the relevant geographic market, and the true relevant geographic markets are likely to be smaller, the HHI measures of market concentration for the District of Columbia understate the degree of market concentration, and understate the increase in market concentration that would occur because of the proposed merger.

26. The proposed merger would substantially lessen competition in the District of Columbia and is likely to enable the combined company, and its sole remaining competitor, Regal, to increase prices. At present, movie exhibitors look to nearby theaters to determine whether a price increase would be profitable. If the only competitor to Loews/AMC in the District of Columbia were a single downtown Regal theater (Regal Gallery Place), it is likely that Loews/AMC would be able to increase price without fear of a significant loss of customers to competitors.

27. Higher prices may take many forms, such as a higher adult evening ticket price, or reduced discounting for matinees, twilight shows, seniors, students, and groups, or reduced services and amenities, higher food concession prices, or additional pre-feature advertisements.

28. Entry by new exhibitors into the District of Columbia is difficult, expensive and time-consuming. Available space to build a modern theater in an appropriate commercial area of the District of Columbia is extremely scarce. Moreover, the time and costs involved in constructing a new movie theater make it unlikely that such a theater could be completed within two years of the proposed merger.

29. The scarcity of available theater space in the District of Columbia is exacerbated by defendant Loews' practice of obtaining "lease restrictions" from real property lessors after Loews terminates or abandons theater leases. In 2002, when Loews, in bankruptcy proceedings, rejected its lease of The Foundry theater in Georgetown, it solicited and obtained an agreement from the lessor that the lessor would not lease the property to any tenant that would operate the property as a theater. When Loews' predecessor, Cineplex Odeon, terminated its lease for the MacArthur Theatre in Palisades in 1997, the company obtained a similar agreement from the lessor.

30. It is unlikely that the existing "art" theaters in the District of Columbia would switch to showing predominantly first-run mainstream films in response to a small but significant non-transitory increase in price. Landmark, which owns the downtown E Street Theatre, specializes in art, independent and foreign films. Landmark's commitment to specialized films is apparent from its website, which states that "Landmark Theatres, the nation's largest art-house chain, features first-run independent and foreign films, restored classics and non-traditional studio fare in 57 theatres representing 208 screens in 14 states and the District of Columbia."

31. The Avalon Twin, a restored theater in Upper Northwest DC, likewise specializes in "independent, foreign, documentary films, classics, and the best commercial films." The Avalon's film program includes a weekly local film-maker night, ethnic film festivals, and other non-traditional fare.

32. The relatively new Regal Gallery Place charges more for adult evening tickets and discount shows than do the Avalon and Landmark E Street. However, neither Avalon nor Landmark E Street has switched to a first-run mainstream play policy in response to Regal's increased price. That indicates that neither Landmark nor Avalon is likely to switch in response to the proposed merger, even if the combined AMC/Loews increases first-run mainstream movie ticket prices.

## VII. REQUESTED RELIEF

Accordingly, the Plaintiff requests:

(a) an adjudication that the proposed merger would violate Section 7 of the Clayton Act, as amended (15 U.S.C. § 18) and Section 28-4502 of the D.C. Antitrust Act (D.C. Official Code § 28-4502 et seq.);

(b) permanent injunctive relief to require divestiture of certain theater assets in the District of Columbia;

(c) injunctive relief to require that Loews and AMC not seek or enforce any contractual provision restricting a lessor's right to operate or lease, for use as a theater, a property in the District of Columbia that defendants had used as a theater;

(d) an award to plaintiff of its costs in this action; and

(e) such other relief as is proper.

DATED: December 21, 2005

        Respectfully submitted,

        ROBERT J. SPAGNOLETTI
        Attorney General for the District of Columbia

        DAVID M. RUBENSTEIN (DC Bar 458770)
        Deputy Attorney General
        Public Safety Division

        _____
        BENNETT RUSHKOFF (DC Bar 386925)
        Chief, Consumer and Trade Protection Section

        _____
        DON A. RESNIKOFF (DC Bar 386688)
        Senior Assistant Attorney General

        _____
        ANIKA SANDERS COOPER (DC Bar 458863)
        Assistant Attorney General
        Office of the Attorney General
        441 4th Street, NW
        Suite 450N
        Washington, DC 20001
        Ph: (202) 727-6241
        Fax: (202) 727-6546

        Attorneys for the District of Columbia